AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Scott D. Alicea-Bailey, being duly sworn, depose and state as follows:

1. I am a police officer in the Town of Southbridge, Massachusetts currently serving at the rank of detective. I have been a police officer with the Southbridge Police Department for over 17 years and have been a detective for 12 years. I am a graduate of the full-time Municipal Police Academy in Boylston, Massachusetts. In addition to this training and the annual in-service training that I attend, I have received specialized training in drug enforcement. I have completed specialized training in criminal investigation including a two-week Basic Narcotics course sponsored by the Massachusetts Criminal Justice Training Council.

2. In March 2015, I was assigned as a Task Force Officer ("TFO") to the Tactical Diversion Squad ("TDS") of the Drug Enforcement Agency ("DEA") stationed in Worcester, Massachusetts. The primary mission of TDS is the enforcement of diverted pharmaceutical drugs and chemicals. As a TFO with DEA, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I have participated in the investigation and arrest of hundreds of narcotics offenders. Through prior investigations and training, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined cocaine, heroin,

and fentanyl as well as other controlled substances. I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of an application for a warrant authorizing the search of the residence of Johanny Torres-Rojas ("TORRES-ROJAS"), born 1966, located within 244 Pleasant Street, Apartment 3W, Worcester, Massachusetts (the "Subject Property").

5. As detailed below, there is probable cause to believe that TORRES-ROJAS has committed violations of Title 21, United States Code, Section 841(a)(1) (the "Subject Offense") on multiple occasions between November 12, 2019 and December 18, 2019.

6. As further detailed below, there is probable cause to believe that the Subject Property contains evidence of crimes, contraband, fruits of crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing crimes, namely, the Subject Offense. A more detailed description of the Subject Property is attached hereto as Exhibit A. A specific list of items to be searched for and seized from the Subject Property is attached hereto as Exhibit B.

7. I am familiar with the facts contained in this affidavit from my own personal participation in this investigation and from oral and written reports made by other DEA agents and other federal, state, and local law enforcement agencies.

8. This affidavit does not contain every fact known to me with respect to this investigation. Rather, it contains only those facts that I believe are necessary to establish probable cause to believe that TORRES-ROJAS committed the Subject Offense and probable cause for the issuance of the requested warrant authorizing the search of the Subject Property.

RELEVANT STATUTES

9. Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person, knowingly or intentionally, to manufacture, distribute, or dispense a controlled substance.

10. Title 21, United States Code, Section 812 identifies fentanyl, cocaine, heroin, and methamphetamine as controlled substances.

EVIDENCE IN SUPPORT OF PROBABLE CAUSE OF THE SUBJECT OFFENSE

A. The Initial Investigation

11. In early November 2019, a confidential source ("CS") contacted a man whom the CS knew as "Tupe," later identified as TORRES-ROJAS.[1] The CS learned of TORRES-ROJAS through a third party and contacted TORRES-ROJAS for the purpose of purchasing fentanyl pills.

12. Between November 5, 2019 and November 12, 2019, the CS had multiple phone and text messages conversations with TORRES-ROJAS, who used telephone number (774) 701-

---

[1] The CS has a criminal history that includes convictions for drug conspiracy and possession with intent to distribute. Further, the CS received monetary consideration in exchange for cooperation on this investigation.

The CS is known to the DEA from prior drug investigations in which the CS worked with the DEA. Based on these prior investigations, which resulted in federal charges against the targets, the DEA finds this CS to be reliable. This affidavit contains information provided by this CS concerning the drug distribution activities of TORRES-ROJAS. The DEA confirmed the information through: (1) the CS making five controlled purchases of fentanyl pills from TORRES-ROJAS; (2) the agents' physical surveillance of the controlled buys, which occurred at TORRES-ROJAS's residence as well as at the Goodwill Store in Worcester; and (3) the agents' review of the audio/video recordings made during the course of the controlled buys. Although the recordings are all in Spanish, agents confirmed the content of the November 20th and 26th controlled buys through a Spanish-speaking state law enforcement officer.

9758.[2]  Unless otherwise indicated, all of the telephone phone conversations were recorded and all of the text messages have been preserved.

13. The CS informed investigators that during the conversations, TORRES-ROJAS told the CS that obtained his drugs from New York suppliers and that he traveled back and forth between New York and Worcester. According to the CS, TORRES-ROJAS further stated that he utilizes his cousin to help him distribute the drugs in Worcester.

14. Since that conversation, and as detailed below, the CS has purchased controlled substances from TORRES-ROJAS on five different dates: November 12, 2019; November 20, 2019; November 26, 2019; December 9, 2019; and, December 18, 2019. Each of these transactions were both video- and audio-recorded.[3]

15. In addition to the audio/video recordings, during each of the drug transactions, nearby agents conducted physical surveillance of TORRES-ROJAS. On November 20th, after the second controlled buy, agents were able to run TORRES-ROJAS's license plate number through the RMV database. In comparing the RMV picture to the surveillance footage, the agents positively identified TORRES-ROJAS as the person selling drugs to the CS during the drug transactions.

---

[2] All of the CS's interactions with TORRES-ROJAS were in Spanish.

[3] Although the controlled buys are video-recorded, TORRES-ROJAS's face is not seen in the videos. However, during both the November 20th and November 26th controlled buys, agents confirmed the presence of TORRES-ROJAS in the Goodwill store through physical surveillance. In addition, prior to the November 20th controlled buy, an agent entered the Goodwill Store and video recorded TORRES-ROJAS in the store.

16.     TORRES-ROJAS does not have a known criminal record.[4]

B.     The November 12, 2019 Controlled Buy

17.     On November 12, in anticipation of the controlled buy of 200 fentanyl pills from TORRES-ROJAS, agents searched the CS and her/his vehicle for contraband and excess currency.  Finding none, agents provided $2,000 to the CS.

18.     Agents then followed the CS as s/he drove to the area of 244 Pleasant Street.  At approximately 5:38 pm, the CS arrived at 244 Pleasant Street and called TORRES-ROJAS, who gave the CS the entry code into the building.[5]  As the CS entered the building, the CS encountered a Hispanic male, who informed the CS that he was there to meet the CS on behalf of TORRES-ROJAS.

19.     Initially, the male requested to complete the drug transaction in the hallway of the building, which the CS declined to do.  The male then directed the CS to his (the Hispanic male's) vehicle.  After they both entered the vehicle, the Spanish male gave to the CS a bag containing pills.  The bag contained 200 round, blue pills marked "M" on one side and "30" on the other side.

---

[4] In 2012. TORRES-ROJAS was charged with assault and battery and disorderly conduct in Worcester state court.  The assault and battery charge was dismissed and the disorderly conducted was dismissed after court costs.

[5] Although the phone conversation was not specifically recorded, the CS's "side" of the telephone conversation was captured by the recording device carried by the CS.

20.     The CS then told the male that TORRES-ROJAS had also promised ecstasy.[6] After the male called TORRES-ROJAS to confirm, the male gave the CS another bag of pills. The second bag contained a mixture of 40 rectangular and round, blue pills.

21.     The CS then handed $2,000 to the male and left the vehicle.

22.     Subsequent to the transaction, the CS called TORRES-ROJAS and informed him that the Hispanic male was careless about conducting the transaction in the open and that the CS did not want to deal with the male again. According to the CS, TORRES-ROJAS agreed and told the CS that he would personally meet with the CS for the next deal.[7]

23.     The CS proceeded directly to a predetermined location, where the CS gave the agents the purported fentanyl and ecstasy that the CS had received from the Hispanic male. The agents searched the CS and her/his vehicle for additional contraband with negative results.

24.     Agents sent the suspected fentanyl and ecstasy to the University of Massachusetts Medical School Drugs of Abuse Laboratory for testing. The pills in the first bag tested positive for the presence of fentanyl and the pills in the second bag tested positive for the presence of methamphetamine.

C.     The November 20, 2019 Controlled Buy

25.     Between November 15, 2019 and November 20, 2019, the CS had multiple recorded phone conversations with TORRES-ROJAS at telephone number (774) 701-9758.

---

[6] "Ecstasy" is the common street name for 3,4-methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance

[7] This phone conversation was not recorded.

26. According to the CS, during the conversations, the CS and TORRES-ROJAS negotiated the further purchase of drugs. TORRES-ROJAS agreed to again sell 200 fentanyl pills to the CS for $2,000.

27. The two agreed to meet the afternoon of November 20th at the Goodwill Store located at 25 Park Avenue, Worcester, Massachusetts.

28. On November 20, 2019, agents searched the CS and her/his vehicle for contraband and excess currency and, finding none, provided $2,000 to the CS.

29. Agents followed the CS as s/he drove from the meet location to the area of 25 Park Avenue. At approximately 12:57 pm, the CS arrived at 25 Park Avenue, entered the Goodwill Store, and called TORRES-ROJAS, who directed the CS to his location in the store.[8]

30. During the meeting within the store, TORRES-ROJAS placed a black sock containing a bag of purported fentanyl pills on the top of his shopping cart. Inside the black sock were 2 clear baggies. One bag contained 200 round, dark-blue pills marked "M" on one side and "30" on the other side. The other bag contained 101 round, light blue pills marked "M" on one side and "30" on the other side.

31. The CS gave TORRES-ROJAS $2,000. The CS then told TORRES-ROJAS that her/his friend was still trying to sell the ecstasy pills that TORRES-ROJAS gave him during the November 12th transaction.

---

[8] Although the phone conversation was not specifically recorded, the CS's "side" of the telephone conversation was captured by the recording device carried by the CS.

32. The CS exited the store, re-entered her/his vehicle, and drove directly to a predetermined location, where the CS gave the agents the pills provided by TORRES-ROJAS. The agents searched the CS and her/his vehicle for additional contraband with negative results.

33. Agents subsequently sent the purported fentanyl pills that TORRES-ROJAS sold to the CS to the DEA Northeast Laboratory for testing. To date, agents have not received the results from the laboratory.

D. The November 26, 2019 Controlled Buy

34. On November 22nd and November 26th, the CS had recorded phone conversations with TORRES-ROJAS at telephone number (774) 701-9758. During the conversations, the CS and TORRES-ROJAS negotiated the further purchase of fentanyl. TORRES-ROJAS agreed to again sell 200 fentanyl pills to the CS for $2,000.

35. The two agreed to again meet on November 26th at the Goodwill Store.

36. On November 26, 2019, agents searched the CS and her/his vehicle for contraband and excess currency. Finding none, agents provided $3,400 to the CS: $2,000 for the drug sale that day, and $1,400 for the 101 purported fentanyl pills and 40 ecstasy pills that TORRES-ROJAS previously "fronted" to the CS.

37. Agents followed the CS from the meet location to the area of 25 Park Avenue. At approximately 2:27 pm, the CS entered the Goodwill Store and called TORRES-ROJAS, who told the CS that he would be arriving shortly by taxi.[9]

---

[9] Although the phone conversation was not specifically recorded, the CS's "side" of the telephone conversation was captured by the recording device carried by the CS.

38. TORRES-ROJAS arrived at the Goodwill Store at approximately 2:18 pm and met the CS inside the store. During the meeting, TORRES-ROJAS handed to the CS a plastic prescription pill bottle. Inside the bottle were 270 round, blue pills marked "M" on one side and "30" on the other side. The bottle also contained a clear baggie containing an additional 130 round, blue pills marked "M" on one side and "30" on the other side.

39. The CS then gave to TORRES-ROJAS the $3,400.

40. The CS exited the store, re-entered his/her vehicle, and drove directly to a predetermined location, where the CS gave the agents the 400 pills provided by TORRES-ROJAS. The agents searched the CS and her/his vehicle for additional contraband with negative results.

41. Agents subsequently sent the purported fentanyl pills to the DEA Northeast Laboratory for testing. To date, agents have not received the results from the laboratory.

E.  The December 9, 2019 Controlled Buy

42. Prior to December 9th, the CS had recorded phone conversations with TORRES-ROJAS at telephone number (774) 701-9758. During the conversations, the CS and TORRES-ROJAS negotiated the further purchase of drugs. TORRES-ROJAS agreed to again sell 200 fentanyl pills to the CS for $2,000 as well as provide free samples of methamphetamine and heroin. The two agreed to meet the afternoon of December 9th at the Subject Property, i.e. 244 Pleasant Street, Apartment 3W, Worcester, Massachusetts.

43. On December 9, agents searched the CS and her/his vehicle for contraband and excess currency. Finding none, agents provided $4,000 to the CS: $2,000 for the drug sale that day, and another $2,000 for the 200 purported fentanyl pills TORRES-ROJAS "fronted" to the CS on November 26.

44. Agents followed the CS as s/he drove to the area of 244 Pleasant Street. The CS arrived at approximately 4:57 pm and called TORRES-ROJAS, who directed the CS to go to the rear of the building and up to the third level of the building where Apartment 3W is located.[10]

45. After the CS walked up to the third floor, the CS met TORRES-ROJAS outside on the porch area. TORRES-ROJAS handed to the CS a sock containing a plastic aspirin bottle. Inside the bottle were 299 round, blue pills marked "M" on one side and "30" on the other side. The bottle additionally contained 2 baggies, one containing a rock-like clear/whitish colored substance and the other containing an off-white colored powdery substance.

46. The CS handed the $4,000 to TORRES-ROJAS.

47. TORRES-ROJAS then asked if CS if s/he were interested in getting a sample of cocaine, to which the CS answered in the affirmative. TORRES-ROJAS went inside of Apartment 3W, returned to the outside porch area, and handed to the CS two small bags of purported cocaine. TORRES-ROJAS told the CS that he could get her/him kilogram quantities of the methamphetamine, cocaine, and heroin.

48. After the exchange, the CS exited 244 Pleasant Street, returned to his/her vehicle, and drove directly to a predetermined location, where the CS gave the agents the purported fentanyl, heroin, methamphetamine, and cocaine. The agents searched the CS and her/his vehicle for additional contraband with negative results. The agents then field-tested the baggie containing the rock-like clear/whitish colored substance, which tested positive for the presence

---

[10] Although the phone conversation was not specifically recorded, the CS's "side" of the telephone conversation was captured by the recording device carried by the CS.

of methamphetamine, and one of the baggies of purported cocaine, which tested positive for the presence of cocaine.[11]

50. Agents subsequently sent the suspected fentanyl, methamphetamine, heroin, and cocaine to the DEA Northeast Laboratory for testing. To date, agents have not received the results from the laboratory.

F. The December 18, 2019 Controlled Buy

50. Prior to December 18th, the CS had recorded phone conversations with TORRES-ROJAS at telephone number (774) 701-9758. During the conversations, the CS and TORRES-ROJAS negotiated the further purchase of purported drugs. TORRES-ROJAS agreed to again sell 200 fentanyl pills to the CS for $2,000.

51. The two agreed to meet the afternoon of December 18th at the Subject Residence. TORRES-ROJAS told the CS that prior to that date, he would be in New York obtaining the pills for the CS.

52. On December 18, 2019 agents searched the CS and her/his vehicle for contraband and excess currency. Finding none, agents provided $3,000 to the CS: $2,000 for the drug sale that day, and another $1,000 for the 99 purported fentanyl pills TORRES-ROJAS previously "fronted" to the CS on December 9.

53. Agents followed the CS as s/he drove to the area of 244 Pleasant Street. The CS arrived at approximately 2:22 pm, walked to the rear of the building, and ascended the stairs to the third level of the building where Apartment 3W is located.

---

[11] Agents did not test the suspected heroin in the event that the heroin also contained the presence of fentanyl.

54. The CS met TORRES-ROJAS outside on the porch area. TORRES-ROJAS handed to the CS two baggies that contained a total of 403 round, blue pills marked "M" one side and "30" on the other side.

55. The CS handed $3000 to TORRES-ROJAS.

56. The CS exited 244 Pleasant Street, returned to his/her vehicle, and drove directly to a predetermined location, where the CS gave the agents the drugs. The agents searched the CS and her/his vehicle for additional contraband with negative results.

57. Agents subsequently sent the suspected fentanyl to the DEA Northeast Laboratory for testing. To date, agents have not received the results from the laboratory.

EVIDENCE IN SUPPORT OF PROBABLE CAUSE
TO SEARCH THE SUBJECT PROPERTY

58. As stated above, both the December 9th and December 18th controlled buys occurred on the third floor porch outside of TORRES-ROJAS's residence.

59. In both instances, the CS entered 244 Pleasant Street through the first level rear left door and went up the stairs to the third floor. The porch to Apartment 3W is located on the landing to the third floor. Apartment 3W is the only apartment on that landing. Although the third floor includes two apartments, Apartment 3E and Apartment 3W, Apartment 3E cannot be accessed through that staircase. The sign "3W" is affixed to the entry door of the apartment.

60. A photograph of the porch landings at 244 Pleasant Street is below:



61.     In both instances, TORRES-ROJAS exited Apartment 3W with the purported fentanyl pills and gave the drugs to the CS on the porch.

62.     On December 9th, after the CS indicated that s/he wanted a sample of cocaine, the CS observed TORRES-ROJAS enter back into Apartment 3W, walk through the kitchen, and enter the furthest room to the left down a hallway.  TORRES-ROJAS then returned with purported cocaine.

A.      The January 2, 2020 Payment

63.     Prior to January 2nd, the CS had recorded phone conversations with TORRES-ROJAS at telephone number (774) 701-9758.  During the conversations, TORRES-ROJAS and the CS discussed the CS paying TORRES-ROJAS the $2,000 owed for the 203 purported fentanyl pills that TORRES-ROJAS had "fronted" the CS on December 18.  TORRES-ROJAS and the CS also discussed having a face-to-face conversation about the CS purchasing additional fentanyl pills, methamphetamine, and cocaine at a future date from TORRES-ROJAS.  The two men agreed to meet the afternoon of January 2nd at the Subject Property.

64. On January 2, agents searched the CS and her/his vehicle for contraband and excess currency. Finding none, agents provided $2,000 to the CS.

65. At approximately 1:15 pm, the CS arrived at 244 Pleasant Street and walked to the rear of the building. The CS then took the door on the rear left side of the building and walked up to the third floor porch.

66. The CS then entered Apartment 3W with TORRES-ROJAS. The CS described Apartment 3W as a rooming house, and TORRES-ROJAS lives in a room in the apartment.

67. The first room within Apartment 3W is the kitchen. The CS and TORRES-ROJAS walked through the kitchen into a hallway. The hallway contained multiple doors; multiple doors on the left side of the hallway, one at the end of the hallway directly facing the CS, and at least one door on the right side of the hallway. The CS followed TORRES-ROJAS to the furthest door on the left side of the hallway and entered the room. The CS noticed that the door did not have a handle but did have a deadbolt lock.

68. Inside the room, the CS observed a bed, a dresser, and a mirror. The CS handed to TORRES-ROJAS $2,000. During the subsequent conversation, the CS and TORRES-ROJAS discussed the CS purchasing larger quantities of fentanyl pills, methamphetamine, and cocaine in the future.

69. Afterwards, the CS then met agents at a predetermined location, where the agents searched the CS and her/his vehicle for contraband with negative results.

SEIZURE AND SEARCH OF CELLPHONES FOUND AT THE SUBJECT PROPERTY

70. As described in <u>Exhibit B</u>, given that TORRES-ROJAS is currently using the Subject Property as his residence, I also seek authorization to search and seize any cell phones seized at that address. I have learned through this investigation that TORRES-ROJAS is using a

cell phone with the phone number (774) 701-9758 to communicate with the CS and to coordinate the CS's purchase of drugs. In addition, I have also learned that TORRES-ROJAS previously provided to the CS a phone number for another phone: (860) 834-5695.

71. Based on my training and experience, individuals like TORRES-ROJAS who are involved in illegal narcotics transactions frequently use more than one cell phone as part of these transactions. Based on my training and experience, I know that individuals involved in illegal narcotics distribution use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. Because cellular telephones are often a principal means of communication, individuals typically keep the phones in close proximity or at their residences.

72. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that

many cellular telephones have the capabilities described above.

73. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities on their cellular telephones. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in <u>Exhibit B</u> on their cellular telephones.

74. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular

phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

75. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts

from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

76.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## APPLE TOUCH ID

77.     It is possible that the phones seized as part of this search warrant will be Apple iPhones. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

78.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID

sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

79.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

80.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. Should agents find TORRES-ROJAS in possession of an Apple iPhone when the search of the Subject Property is executed, I request that the Court authorize law enforcement to press TORRES-ROJAS's fingers to the iPhone for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

CONCLUSION

81. Based on the foregoing, there is probable cause to believe that Johanny TORRES-ROJAS did knowingly and intentionally distribute fentanyl, methamphetamine, and cocaine in violation of Title 21, United States Code, Section 841(a)(1).

82. I further submit that probable cause exists to believe that evidence, fruits and instrumentalities of the Subject Offense, as described in <u>Exhibit B</u>, will be found at the Subject Property.

ACCORDINGLY, I respectfully request that the Court issue a warrant authorizing investigators to search the bedroom located within Apartment 3W that is furthest down the hallway to the left, located at 244 Pleasant Street, Worcester, Massachusetts (described in more detail in <u>Exhibit A</u>), for the items described in <u>Exhibit B</u>.

I declare that the foregoing is true and correct.

_____
Scott D. Alicea-Bailey
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me,
this 10th day of January, 2020.

_____
Honorable David H. Hennessy
United States Magistrate Judge
District of Massachusetts